UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. ESTEBAN RUIZ, | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | No. 08 C 4582 |
| JOSEPH YURKOVICH, Warden, Jacksonville Correctional Center, | ) ) ) ) | Judge Rebecca R. Pallmeyer |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

In 2005, following a jury trial, Petitioner Esteban Ruiz was convicted of reckless homicide and sentenced to a 10-year term of imprisonment. He now seeks relief from his conviction pursuant to 28 U.S.C. § 2254, raising three claims: (1) he contends that the Illinois reckless homicide statute violates the Equal Protection Clause of the Fourteenth Amendment because there is no rational basis for differences between that statute and the Illinois driving under the influence ("DUI") statute; (2) Petitioner urges that he was denied the trial counsel of his choice in violation of the Sixth Amendment; and (3) he argues that the Illinois reckless homicide statute violates the Due Process Clause by creating a mandatory presumption of guilt. (Pet. for Writ of Habeas Corpus at 5-6.) For the reasons set forth below, Ruiz's petition for habeas corpus relief is denied.

## BACKGROUND

**Factual Background**

On federal habeas review, the state court's factual findings are presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Daniels v. Knight*, 476 F.3d 426, 434 (7th Cir. 2007). Clear and convincing evidence is that which shows a fact to be "highly probable." *United States v. Boos*, 329 F.3d 907, 911 (7th Cir. 2003). Petitioner provides no evidence to rebut the Illinois courts' findings. Accordingly, this court adopts the factual account set

forth in the opinion of the Illinois Appellate Court on direct appeal. *People v. Ruiz*, No. 1-05-2883 at 1 (1st Dist. Ill. App. Mar. 30, 2007) (Rule 23 Order, Ex. A to Resp's Answer.)

On August 29, 2002, Petitioner crashed his van into the side of a car carrying six individuals. (*Id.* at 2.) One of the individuals, a two-year old girl, died as a result of the collision. (*Id.*) The State charged Petitioner with three counts of reckless homicide and six counts of driving under the influence of alcohol. (*Id.*) At trial, the State *nolle prossed* all charges, with the exception of one count of reckless homicide. (*Id.*)

Petitioner was initially represented by the public defender, but at some point, he retained attorney Irving Federman, who entered an appearance on Petitioner's behalf. (*Ruiz*, No. 1-05-2883 at 2; Trial Tr. at C32.)[1] Thereafter, Petitioner fired Federman and retained attorney R. Schelly to represent him. (*Ruiz*, No. 1-05-2883 at 2; Trial Tr. at C46.)[2] Trial was set to begin on January 14, 2004, but Petitioner fired Schelly and, on a date not stated in the record, attorney Raymond L. Prusak entered an appearance for the Petitioner. (*Ruiz*, No. 1-05-2883 at 2., *Id.*; Trial Tr. at C61.) On September 20, 2004, Petitioner's case was again set for trial, but Petitioner again fired his attorney and two new attorneys, Gus Santana and David Sotomayor, entered appearances for him, necessitating a further continuance of the trial date. (*Ruiz*, No. 1-05-2883 at 3; Trial Tr. at C111, C112.) At some point, Attorney Mercedes Jaile entered an additional appearance for Petitioner, as well. (*Ruiz*, No. 1-05-2883 at 2; Trial Tr. at C69.)

On February 1, 2005, Petitioner's case finally proceeded to trial. (*Id.*) That morning, however, the trial judge advised Petitioner that, according to Attorney Sotomayor, Attorney Santana would not be present at the trial due to family emergency. (*Id.*) (Why Sotomayor did not provide this information to Petitioner directly is not explained in the record.) The court announced that the

---

[1] Although the appellate court opinion spells the attorney's name is "Feldmen," the trial record indicates his name is "Irving Federman." *See* Trial Tr. at C32.

[2] Again, this court adopts the spelling that appears in the trial record.

2

trial would nevertheless go forward as scheduled, as both Sotomayor and Jaile were ready to proceed. (*Id.*) In response, Petitioner stated, "I don't know. Well, if they—you say that it has to go to trial, fine, but I would like my other attorney here." (*Id.*) The court noted that Attorney Santana had not contacted the court or returned calls from the court or the State's Attorney's Office, and Petitioner admitted that he himself had not spoken with Santana "in a long time." (*Id.*) The court gave Sotomayor an opportunity to call Santana, but after an off-the-record discussion, jury selection began. (*Id.* at 4.) There is no indication whether Sotomayor actually reached Santana by phone, but Santana played no role in the trial and there is no record of any request for a further continuance so that Santana could participate.

At trial, Raul DeLeon testified that on August 29, 2002, around 3:00 p.m., Petitioner, DeLeon, and two friends drank beer in an alley outside a garage near 5100 South Talman Avenue. (*Id.*) DeLeon estimated that Petitioner consumed seven beers. (*Id.*) Then, around 5:00 pm, Petitioner entered his van, which was parked in the alley behind South Talman, and quickly proceeded to crash into a post located in the alley. (*Id.*) After hitting the post, Petitioner drove away. (*Id.* at 4-5.) Three witnesses—Lugenia Stepp and Carlotta Cathey, two neighbors who were talking together in front of their homes on Washtenaw Avenue, and Cassandra Muhammad, who was driving behind Petitioner's van—all testified that Petitioner drove down the street at approximately 45 to 50 miles per hour. (*Id.* at 6-7.) Cathey testified that she observed Petitioner raising a can to his mouth while driving. (*Id.*) Finally, Stepp, Cathey, and Muhammad confirmed that as Petitioner approached the stop sign at the intersection of Washtenaw Avenue and Marquette Road, he did not attempt to use his brakes, slow down, or even look both ways. (*Id.*) Rather, Petitioner drove straight through the stop sign and crashed into a car. (*Id.*)

Petitioner also took the stand at trial. He conceded that he was driving fast initially, but asserted that he did so in order to get away from some sort of gang altercation. (*Id.* at 14.) He claimed that two gang members shot him with "something" and that he drove away quickly and hit

3

the pole "because they were going to continue bothering [him]." (*Id.*) Despite these fears, Petitioner claimed he approached the stop sign at the intersection of Washtenaw Avenue and Marquette Road at a speed of no more than 20 miles per hour. (*Id.* at 15.) Petitioner also insisted that, contrary to the testimony of Stepp, Cathey, and Muhammad, he did in fact slow down before entering the intersection, but never saw the car coming before he crashed into it. (*Id.* at 15-16.) He admitted that he did not come to a complete stop but explained that he was scared and "didn't have any feelings [in] [his] arm or [his] hand." (*Id.*) Dan Goedert, a nurse who later treated Petitioner, testified that although he did not appear to have suffered a gunshot wound, Petitioner did have a laceration on his arm. (*Id.* at 11.)

Officer Joseph Walsh and his partner were the first police officers at the scene of the crash. (*Id.* at 7.) Officer Walsh approached Petitioner, still seated in the driver's seat, and immediately detected the odor of alcohol on Petitioner's breath. (*Id.* at 7-8.) Because the crash had jammed the driver side door, Petitioner was forced to exit via the passenger side door; as he did so, two empty Budweiser cans fell to the ground. (*Id.*) Petitioner stumbled upon exiting the van and leaned on the side of the van for support as he walked to the rear of the vehicle, apparently at the officer's direction. (*Id.*) Walsh observed that Petitioner's eyes were glassy and bloodshot, that his speech was slurred, and that he leaned back against the van for support. (*Id.*) A paramedic who responded to the crash, Boguslaw Talaga, testified and confirmed Walsh's conclusion that Petitioner was intoxicated. (*Id.* at 9.)

Finally, Officer Richard Barber, who arrived on the scene after the other police and medical providers, testified that the ambulance in which Petitioner was being treated smelled strongly of alcohol, and that Petitioner's speech was slurred and mumbled. (*Id.* at 10.) Barber remained at the crash site to conduct an investigation of the crash scene, during which he collected a total of five beer cans from inside and outside the van. (*Id.*) Barber concluded that Petitioner was under the influence of alcohol, based upon Barber's personal and professional experience, and his

4

observations that Petitioner (1) had the smell of alcohol on his breath, (2) had slurred/mumbled speech, (3) had bloodshot eyes, (4) had beer cans in his van, (5) admitted to drinking, and (6) failed to stop at a clearly marked stop sign. (*Id.* at 11.) After completing his on-scene investigations, Barber drove to Holy Cross Hospital, where the ambulance had taken Petitioner to receive treatment. (*Id.* at 10.) Barber conferred with Dan Goedert, the nurse, and requested that Goedert obtain blood and urine samples from the Petitioner. (*Id.* at 11.)

Before Goedert took the samples, he read the hospital's standard consent form to Petitioner, and Goedert, Petitioner, and Barber all signed the form. (*Id.*) After he obtained consent, Goedert drew blood and took a urine sample from Petitioner using a standard Chicago Police Department kit provided by Barber. (*Id.*) According to Goedert, the procedure involved placing a tourniquet on Petitioner's left arm, cleansing the extraction area with an iodine preparation that did not contain alcohol, inserting a needle, drawing blood into vials through a vacuum, applying a dressing, and then removing the tourniquet. (*Id.* at 12.) Goedert testified that this method of blood extraction is generally accepted in the medical community and that he had employed this method many, many times before. (*Id.*)

While Petitioner was in the emergency room, he continued to receive intravenous saline and an intravenous antibiotic, neither of which contained any alcohol. (*Id.*) Petitioner also received a tetanus shot. (*Id.*) The injection site for the tetanus shot was cleaned with isopropyl alcohol, but Goedert explained that isopropyl alcohol differs from the ethanol alcohol found in alcoholic beverages, and that isopropyl alcohol is not usually ingested. (*Id.*) The doctor who examined Petitioner, Dr. Eggebeen, did not testify at trial, but both parties stipulated as to his testimony: Dr. Eggebeen noted that Petitioner exhibited "acute alcohol intoxication." He also confirmed that the adult tetanus booster did not contain any alcohol and would not increase Petitioner's blood alcohol content. (*Id.* at 13.)

Contrary to Goedert's and Eggebeen's testimony, Petitioner contended that no one from the

5

hospital ever sought his consent before drawing his blood sample. (*Id.* at 16.) He claims his signature on the Holy Cross Hospital consent form is a forgery. (*Id.*) Petitioner claims, further, that Goedert drew the blood from his right arm, though, as Goedert himself testified, drawing blood from an arm in which an IV line was inserted is improper. (*Id.*)

Petitioner's blood and urine samples were ultimately tested by Laura LeDonne, a forensic scientist for the Illinois State Police. (*Id.*) LeDonne concluded that Petitioner's blood contained .274 grams per deciliter of ethanol alcohol, well in excess of the legal limit of .08 grams per deciliter. (*Id.*)[3] LeDonne found no other forms of alcohol or contaminants in the sample. (*Id.*)

On February 4, 2005, the jury found Petitioner guilty of reckless homicide. (*Id.* at 21.) On March 9, 2005, before sentencing was to take place, Attorneys Sotomayor and Santana appeared before the circuit court in order to file a post-trial motion on Petitioner's behalf and to withdraw from the case, as Petitioner had filed complaints against them with the ARDC. (*Id.* at 22.) The circuit court granted both attorneys leave to withdraw and appointed the public defender to represent Petitioner for post-trial motions. (*Id.*) After post-trial motions were heard and denied, the court imposed a sentence of 10 years incarceration. (*Id.* at 23.)

**Procedural History**

Petitioner took a timely direct appeal in the state courts presenting the three claims he presses here: that (1) the Illinois reckless homicide statute violates equal protection because it lacks a rational basis compared with the Illinois DUI statute; (2) the trial court denied Petitioner's right to counsel of his choice; and (3) the Illinois reckless homicide statute creates an unconstitutional mandatory presumption. (*Id.* at 23, 38, 43.) The appeals court affirmed Petitioner's conviction and sentence. (*Id.* at 48.) Petitioner filed a petition for leave to appeal ("PLA") in the

---

[3] Although the appellate court opinion states that Petitioner's blood alcohol content was "0.274 grams per liter of ethanol alcohol," the trial record correctly states that his blood alcohol content is "0.274 grams per deciliter of ethanol alcohol."

Illinois Supreme Court, raising the same three issues he raised on direct appeal in the appellate court. (PLA, Ex. E to Resp's Answer.) The Illinois Supreme Court denied Petitioner's PLA on May 29, 2008. *See People v. Ruiz*, 228 Ill.2d 548, 889 N.E.2d 1121 (Ill. 2008). Respondent concedes that the petition before this court is timely, and that Petitioner has properly exhausted all available state court remedies. (Resp.'s Answer at 3.)

## **DISCUSSION**

This court may grant habeas corpus relief only when a decision by the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court's decision is "contrary to" clearly established law if "the state court arrive[d] at a conclusion opposite to that reached by this [Supreme] Court on a question of law" or if "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [that reached by the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 405, 120 S. Ct. 1495, 1519 (2000) (O'Connor, J., concurring). A state court's decision is an "unreasonable application" of clearly established federal law if the state court "identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular state prisoner's case" or "if the state court either unreasonably extends a legal principle from [the Supreme Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407, 120 S.Ct. at 1520. An "unreasonable application" of federal law must not only be incorrect, but must lie "well outside the boundaries of permissible differences of opinion." *Etherly v. Davis*, 619 F.3d 654, 660 (7th Cir. 2010) (quoting *Starkweather v. Smith,* 574 F.3d 399, 402 (7th Cir. 2009) and *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir.2002)). The court evaluates Petitioner's claims with this high standard in mind.

7

**Claim 1—Petitioner's Right to Equal Protection**

Petitioner's equal protection challenge focuses on the language of the Illinois reckless homicide statute, 720 ILCS 5/9-3(C)(1).[4] According to Petitioner, his conviction under this provision violates the Equal Protection Clause of the Fourteenth Amendment when compared with the Illinois DUI law, 625 ILCS 5/11-501.2. Petitioner asserts that an individual charged with a violation of the DUI statute gets the benefit of certain procedures regarding blood collection that must be followed in order for the blood-alcohol content test to be admissible in court. As Petitioner reads the reckless homicide statute, an individual charged under that statute is not protected by similar procedural requirements. *Compare* 720 ILCS 5/9-3(C)(1) (2004) *with* 625 ILCS 5/11-501.2(a)(1).[5] In other words, Petitioner contends, the results of the blood-alcohol content test may be admitted against an individual charged under the reckless homicide statute, even if law

---

[4] Petitioner cites to a version of the statute that was effective prior to December 31, 2004. Although the offense conduct in this case occurred in 2002, the trial took place in February 2005. By the time of his trial, certain of the statutory provisions he challenges here had been amended. Respondent has addressed Petitioner's arguments on their merits, however, and this court will do so, as well.

[5] The DUI statute directs that testing be performed pursuant to procedures established by the State Police:

> Chemical analyses of the person's blood, urine, breath or other bodily substance to be considered valid under the provisions of this Section shall have been performed according to standards promulgated by the Department of State Police by a licensed physician, registered nurse, trained phlebotomist, certified paramedic, or other individual possessing a valid permit issued by that Department for this purpose. The Director of State Police is authorized to approve satisfactory techniques or methods, to ascertain the qualifications and competence of individuals to conduct such analyses, to issue permits which shall be subject to termination or revocation at the discretion of that Department and to certify the accuracy of breath testing equipment. The Department of State Police shall prescribe regulations as necessary to implement this Section.

625 ILCS 5/11-501.2(a)(1). Neither Petitioner nor the State ever addressed or cited to the pertinent Department of State Police regulations mentioned within the statute. *People v. Ruiz*, No. 1-05-2883 at 40-41 (1st Dist. Ill. App. Mar. 30, 2007) (Rule 23 Order, Ex. A to Resp's Answer). Instead, both parties relied on witness testimony as to the content of these regulations. (*Id.*)

8

enforcement does not follow any procedures regarding how the blood used in the test is collected.

Petitioner's argument fails for several reasons. First, the plain language of the reckless homicide statute, 720 ILCS 5/9-3(C)(1) (2004), appears to defeat Petitioner's assumption that persons charged with reckless conduct are deprived of appropriate blood-alcohol testing procedures. That statute provides that "[f]or the purposes of this Section, a person shall be considered to be under the influence of alcohol or other drugs while: . . . [t]he alcohol concentration in the person's blood or breath is 0.08 or more *based on the definition of blood and breath units in Section 11-501.2 of the Illinois Vehicle Code.*" (emphasis added). As the court reads this language, the reckless homicide statute assumes adherence to the procedures required by 625 ILCS 5/11-501.2; that is, the same procedures that are required under the DUI statute are also required under the reckless homicide statute.

In any event, regardless how the reckless homicide statute is interpreted, the record here provides no factual support for the contention that Petitioner was deprived of appropriately careful blood testing procedures. To the contrary, the police and medical personnel *did* follow the procedures required under the DUI statute, despite the fact that Petitioner was ultimately convicted under the reckless homicide statute.[6] Petitioner notes that a statute that singles out a class of individuals in an "arbitrary and irrational fashion" violates the Equal Protection Clause, even under the most deferential standard of review. *Bankers Life & Casualty Co. v. Crenshaw*, 486 U.S. 71, 83, 108 S. Ct. 1645, 1653 (1988). In order for the Equal Protection Clause to come into play, however, Petitioner must demonstrate that "the law lays an unequal hand on those who have committed intrinsically the same quality of offense . . . .." *Skinner v. Oklahoma*, 316 U.S. 535, 541,

---

[6] In fact, the DUI testing procedures were directly applicable in this case. Petitioner was initially charged with three counts of reckless homicide and six counts of aggravated driving under the influence. *People v. Ruiz*, No. 1-05-2883 at 2 (1st Dist. Ill. App. Mar. 30, 2007) (Rule 23 Order, Ex. A to Resp's Answer). Thus, because the original charges included offenses under the DUI statute, the state was required by 625 ILCS 5/11-501.2(a) to comply with DUI testing procedures.

62 S. Ct. 1110, 1113 (1942). That did not happen here: Petitionerr's blood was tested in the same way that a DUI defendant's blood would be tested.

Petitioner challenges this conclusion, urging that the officer drew blood from the wrong arm and violated State Police regulations during the process. The fact that the blood alcohol evidence was admitted suggests that the trial court was satisfied that appropriate procedures were followed. In arguing that the purported violations justify habeas relief, Petitioner makes much of the state's response to his argument concerning the constitutionality of the reckless homicide statute: he says the State responded by asserting that a harmless error analysis should apply. Petitioner insists that the state courts erred by failing to acknowledge that "a harmless error analysis was *not* available in this cause." (Pet. for Writ of Habeas Corpus at 5.) This court is uncertain why not: any error in admitting the blood alcohol evidence may well have been harmless in the case, where there was ample evidence of Petitioner's recklessness, even apart from his alcohol consumption. In any event, although the state may have urged harmless error, the Illinois Appellate Court itself did not actually apply a harmless error analysis. *People v. Ruiz*, No. 1-05-2883 at 39 (1st Dist. Ill. App. Mar. 30, 2007) (Rule 23 Order, Ex. A to Resp's Answer). The state court found no error at all. (*Id.* at 39-41). The court further intimated that, even assuming the reckless homicide statute imposed fewer safeguards, Petitioner would not have standing to challenge the statute because he in fact received those protections furnished by the DUI statute. (*Id.* at 39 n.2.)

Finally, Petitioner directs this court's attention to the case *Holmes v. South Carolina*, and urges claiming that the state courts failed to address this binding Supreme Court precedent. 547 U.S. 319, 126 S. Ct. 1727 (2006). The *Holmes* case is not applicable here. At issue in *Holmes* was "whether a criminal defendant's federal constitutional rights are violated by [a South Carolina] evidence rule under which a defendant may not introduce proof of third-party guilt if the prosecution has introduced forensic evidence that, if believed, strongly supports a guilty verdict." *Holmes*, 547 U.S. at 321, 126 S. Ct. at 1729. The *Holmes* Court ultimately concluded that the South Carolina

rule prohibiting the defendant from introducing relevant evidence was "arbitrary" and "violates a criminal defendant's right to have a meaningful opportunity to present a complete defense." *Holmes*, 547 U.S. at 331, 126 S. Ct. at 1735 (internal quotations omitted). *Holmes* held that a state law may not tie the defendant's hands by prohibiting him from raising a valid defense.

No state law tied Petitioner's hands in this case. He has not suggested that the state court barred him from introducing any evidence in his defense.[7] Petitioner did offer evidence at trial; he challenged the evidence that he behaved recklessly and specifically challenged testimony that DUI testing procedures were properly followed. The fact that the jury was not persuaded by this evidence and ultimately found against him does not raise any constitutional issues. *Holmes* is not applicable to Petitioner's case, and the state courts' decision not to address *Holmes* provides no basis for habeas relief. *See* 28 U.S.C. § 2254(d).

Petitioner's equal protection claim fails.

**Claim II—Petitioner's Right to Choice of Counsel**

Next, Petitioner claims that he was wrongly denied his right to choice of counsel in violation of the Sixth Amendment when the circuit court proceeded to trial in the absence of one of Petitioner's three attorneys. According to Petitioner, the Illinois Supreme Court's rejection of this claim rendered his right to counsel meaningless in that it gave the trial court unlimited discretion to "control its calendar."

This claim, too, fails both factually and legally. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. CONST. amend. VI. As the Supreme Court has explained, "an element of this

---

[7] Even the version of the reckless homicide statute that Petitioner challenges (as noted earlier, the court does not believe that version was in effect at the time of his trial) does not bar the introduction of defense evidence. *See* 720 ILCS 5/9-3(b) (2004) (explaining that "in cases of reckless homicide, being under the influence of alcohol . . . at the time of the alleged violation shall be presumed to be evidence of a reckless act *unless disproved by evidence to the contrary*") (emphasis added).

right is the right of a defendant who does not require appointed counsel to choose who will represent him." *United States v. Gonzales-Lopez*, 548 U.S. 140, 144, 126 S. Ct. 2557, 2561 (2006). Nevertheless, "the right to counsel of choice 'is circumscribed in several important respects.'" *Gonzales-Lopez*, 548 U.S. at 144, 126 S. Ct. at 2561 (quoting *Wheat v. United States*, 486 U.S. 153, 159, 108 S. Ct. 1692, 1697 (1988)). Thus, the Court has long "recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness and against the demands of its calendar." *Gonzales-Lopez*, 548 U.S. at 152, 126 S. Ct. at 2565-66 (internal citations omitted). A choice-of-counsel violation only occurs when the defendant's choice is "*wrongfully* denied." *Gonzales-Lopez*, 548 U.S. at 150, 126 S. Ct. at 2565 (emphasis added) In *Gonzales-Lopez*, defendant's attorney of choice was ready and willing to represent him at trial, but the trial court refused to permit him to participate, denying the attorney's motion for admission admission *pro hac vice* because the attorney had violated a disciplinary rule in an unrelated case. *Gonzales-Lopez*, 548 U.S. at 142, 126 S. Ct. at 2559.

In the case before this court, in contrast, the trial court did not preclude Attorney Santana from representing Petitioner. Nor did Santana come to court and ask for a continuance–he simply failed to show up for trial, apparently due to a personal matter. There is no indication that Petitioner understood Santana to be his lead attorney; Petitioner admitted that he had not spoken with Santana "in a long time." *People v. Ruiz*, No. 1-05-2883 at 2 (1st Dist. Ill. App. Mar. 30, 2007) (Rule 23 Order, Ex. A to Resp's Answer.) Nor does it appear that either Petitioner or his other attorneys, Sotomayor and Jaile, asked for a continuance so that Santana could participate. The closest he came to making such a request was the statement, "Well, if . . . you say that it has to go to trial, fine, but I would like my other attorney here"–hardly a formal request for a continuance.

Indeed, if the court interpreted Petitioner's comment as a request for a continuance, the court acted reasonably in denying it. Petitioner's choice-of-counsel issues had already significantly delayed his trial, *see People v. Ruiz*, No. 1-05-2883 at 2 (1st Dist. Ill. App. Mar. 30, 2007) (Rule 23

12

Order, Ex. A to Resp's Answer), originally set to begin in January 2004 and postponed twice when he changed attorneys. (*Id.* at 3.) There were numerous witnesses needed for trial; in addition to Petitioner's one witness, the State called 17 witnesses. (*Id.* at 24-25.) Finally, because Attorney Santana had not communicated with the court, the court had no way of knowing how long a continuance would be necessary. Proceeding to trial without Santana was hardly unreasonable.

In conclusion, the state courts neither unreasonably applied federal law, including the law as stated by the Supreme Court in *Gonzales-Lopez*, nor made an unreasonable determination of the facts in light of the evidence presented to the state court. *See* 28 U.S.C. § 2254(d). Petitioner is not entitled to habeas relief on his choice-of-counsel claim.

**Claim III—Right to Due Process**

Finally, Petitioner claims that the reckless homicide statute creates a mandatory presumption in violation of the Due Process Clause of the Fourteenth Amendment. The reckless homicide statute effective at the time that Petitioner was charged states, in relevant part, that "a person shall be considered to be under the influence of alcohol or other drugs while . . . [t]he alcohol concentration in the person's blood or breath is 0.08 or more based on the definition of blood and breath units in Section 11-501.2 of the Illinois Vehicle Code." 720 ILCS 5/9-3(C)(1) (2004).[8] Petitioner claims this provision establishes a mandatory presumption that violates the Due Process Clause of the Fourteenth Amendment.

The Due Process Clause "denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt *every* element of the charged offense." *Carella v. California*, 491 U.S. 263, 265, 109 S. Ct. 2419, 2420 (1989) (*citing In re Winship,* 397 U.S. 358, 364, 90 S. Ct. 1068, 1073 (1970)) (emphasis added). A statute that creates a mandatory

---

[8] Again, this version had been amended as of the time of Petitioner's trial, and the parties have not explained which version of the statute, if any, was presented to the jury. As the Illinois Appellate Court also presumed the applicability of the 2004 version of the statute, this court refers to that version in addressing Petitioner's due process argument.

presumption and thus relieves the State of its burden violates a defendant's due process rights. *See Carella*, 491 U.S. at 265, 109 S.Ct. at 2420 (such instructions "subvert the presumption of innocence accorded to accused persons and also invade the truth-finding task assigned solely to juries in criminal cases"); *see also Sandstrom v. Montana*, 442 U.S. 510, 521, 99 S. Ct. 2450, 2458 (1979) (concluding that a presumption in a jury instruction violated the Due Process Clause because it relieved the government of its burden to prove each element of a crime).

Had a mandatory presumption been applied in Petitioner's case, he might well have a basis for this challenge. Indeed, in *People v Pomykala*, 203 Ill.2d 198, 209, 784 N.E.2d 784, 791 (2003), the Illinois Supreme Court struck down language from an earlier version of the reckless homicide statute that established a mandatory presumption of recklessness in any case where the defendant was under the influence of alcohol or drugs at the time of the charged conduct. *Pomykala* came down in 2003, however, and Petitioner was tried in 2005. In trials conducted after *Pomykala*, prosecutors did not rely on that presumption, *see, e.g., People v. Mendoza*, 354 Ill. App.3d 621, 821 N.E.2d 740 (1st Dist. 2004), and there is no basis to conclude they did in Petitioner's case.

The provision that Petitioner here challenges, 720 ILCS 5/9-3(c)(1), does not create a presumption of recklessness, let alone a mandatory presumption. Instead, the challenged language provides that a defendant is "considered" to be under the influence if his blood-alcohol level is 0.08 or more. Saying that somebody is "considered" to be *under the influence* is not the same thing as saying that somebody who is under the influence is "considered" (or "presumed") to be *reckless*. In Ruiz's case, the only charge was recklessness; thus, though there was ample evidence that Ruiz was intoxicated, such a finding was not necessary for the jury's verdict on the reckless homicide charge. Another Illinois court made this point in a case similar to this one:

> [W]e conclude that section 9-3(c)(1) and IPI Criminal 4th No. 7.09X do not contain mandatory presumptions that impermissibly intrude upon defendant's right to due process. Whether the language of the statute is viewed as a presumption or a definition, the language does not relieve the State of its burden of proof on the reckless homicide charge. *See Henderson*, 329 Ill. App.3d at 821, 263 Ill. Dec. 462,

14

> 768 N.E.2d 222. Here, the State introduced evidence that, at the time of the collision, defendant was driving his vehicle at an excessive rate of speed and entered the intersection of Gary Avenue and Lake Street despite the red traffic signal. Therefore, the State introduced evidence not only of defendant's intoxication, but also of recklessness by defendant in performing the acts that resulted in the victim's death. Accordingly, we conclude that the State introduced sufficient evidence of defendant's recklessness and that the State was not relieved of its burden of proof on the reckless homicide charges. *See Beck*, 295 Ill. App.3d at 1064, 230 Ill. Dec. 419, 693 N.E.2d 897.

*People v. Henry*, 343 Ill. App.3d 133, 796 N.E.2d 718 (2nd Dist. 2003). The state courts in Petitioner's case cited *Henry, Henderson,* and *Beck*. In short, the Illinois courts have concluded that defining the term "under the influence" by reference to a blood-alcohol level neither creates a mandatory presumption nor relieves the State's burden of proving Petitioner's culpability for the crime of reckless homicide. This conclusion is not inconsistent with the Supreme Court's due process jurisprudence. Petitioner is not entitled to habeas relief on the basis of this claim.

## **CONCLUSION**

For the reasons set forth above, Petitioner Ruiz's Petition for Writ of Habeas Corpus is denied. This case is dismissed.

ENTER:

Dated: December 13, 2010

_____
REBECCA R. PALLMEYER
United States District Judge